EDWIN PRATHER, SBN 190536
PRATHER LAW OFFICES
245 Fifth Street, Suite 103
San Francisco, CA 94103
Telephone: 415.881.7774
Email: edwin@pratherlawoffices.com

Attorneys for Defendant
MARK DJANGO HICKS

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MARK DJANGO HICKS, *et al.,*<br><br>Defendants. | Case No.: CR 20-0108 JD<br>                    CR 13-0079 JD<br><br>**DEFENDANT MARK HICKS' SENTENCING MEMORANDUM AND REQUEST FOR A DOWNWARD VARIANCE**<br><br>Judge: Hon. James Donato<br>Date and Time: September 12, 2022, at 10:30 a.m. |

# TABLE OF CONTENTS

I.      INTRODUCTION                                                        3

II.     RELEVANT FACTUAL SUMMARY                                            3

III.    PROCEDURAL HISTORY                                                  5

IV.     OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT                  6

V.      SENTENCING GUIDELINES CALCULATION                                   6

VI.     SENTENCING RECOMMENDATION                                           8

        A.  The Nature and Circumstances of the Offense, as well as Mr. Hicks's
            History and Characteristics, Support the Recommended Sentence   8

            1.  Nature and Circumstances of Mr. Hicks's Offense            8

            2.  Mr. Hicks's History and Characteristics                    9

        B.  A 66-Month Sentence Followed by Three Years of Supervised Release
            Meets the Directives of 18 U.S.C. § 3553(a)(2)                 17

            1.  The Recommended Sentence Reflects the Seriousness of the Offense,
                Promotes Respect for the Law, and Provides Just Punishment  17

            2.  The Recommended Sentence Affords Adequate Deterrence       18

        C.  A Sentence of 66 Months Followed by Three Years of Supervised Release
            Avoids Unwanted Sentencing Disparities                        18

        D.  The Court Should Allow Mr. Hicks to Surrender Directly to the BOP
            Federal Medical Center to Which He is Assigned                 20

        E.  Mr. Hicks Should Be Sentenced to Ten Months in Custody and Ten
            Months Home Detention on his Form 12 Violation                21

VII.    CONCLUSION                                                         21

DEFENDANT MARK DJANGO HICKS'S SENTENCING MEMORANDUM AND REQUEST
FOR DOWNWARD VARIANCE [CASE NOS. CR 20-0108 JD and CR 13-0079 JD]

2

## I. INTRODUCTION

Mark Django Hicks stands before the Court having pled guilty to Count One, a violation of 18 U.S.C. § 1349 (Conspiracy to Commit Wire Fraud and Bank Fraud), Count Three, a violation of 18 U.S.C. § 1343 (Wire Fraud), Count 13, a violation of 18 U.S.C. § 1344(1) (Bank Fraud), and Count 21, a violation of 18 U.S.C. § 1028A (Aggravated Identity Theft). For the reasons indicated herein, the Court should impose a sentence on Mr. Hicks to include a term of incarceration of 66 months[1] and a three-year term of supervised release. For Mr. Hicks' Form 12 violation, the Court should sentence Mr. Hicks to an additional ten months of custody time to be served consecutively, as well as an additional term of home detention for ten months as a term and condition of supervised release. Such a sentence is an appropriate resolution to this case to both punish Mr. Hicks for his actions, but also to take in consideration Mr. Hicks's personal circumstances under 18 U.S.C. § 3553(a).

## II. RELEVANT FACTUAL SUMMARY

From at least 2017, co-defendant Dioysius Costello created a scheme to impersonate individuals to gain access to their bank accounts. Costello obtained the personal information of other individuals and then enlisted others to withdraw cash from banks by impersonating those individuals who had accounts with those banks. U.S. Probation Presentence Investigation Report (PSR), ¶ 17. Costello provided counterfeit identification and other documents to co-conspirators such as Susan Arreola-Martin in order to further the conspiracy. *Id.* Costello drove Arreola-Martin to banks in California, Oregon, Texas, and Nevada, to impersonate individuals and

---

[1] The 66-month sentence would be comprised of a 42-month sentence on the Counts One, three, and Thirteen, and a 24-month consecutive sentence on Count Twenty-One for Aggravated Identify Theft.

withdraw money from their accounts. *Id.* Arreola-Martin was paid a fee and Costello kept the balance of the funds.

In 2018 and 2019, the conspiracy to impersonate individuals had developed further. Costello and Arreola-Martin entered into a further conspiracy with Mark Hicks, Demarcus Hicks, Tyrone Alexander Jones, Christopher Pool, and Leif Skorochod to impersonate individuals and using their information to obtain bank loans using their real property for collateral. PSR, ¶ 18.

Mark Hicks and Costello obtained the personal information of previously unknown individuals using a website. Thereafter, Mark Hicks, obtained credit report and other financial information about the individuals. With the help of an uncharged co-conspirator, Mark Hicks opened bank accounts, set up e-mail addresses, and communicated with lenders impersonating the individuals in question, thereby stealing their identities.

Thereafter, Costello and Demarcus Hicks furthered the fraud, by recruiting -- in addition to Arreola-Martin -- Tyrone Alexander Jones, Christopher Pool, and Leif Skorochod to impersonate individuals. These impersonations were necessary so that the co-conspirators could enter into the lending institutions in order to sign loan documents and the notary book, to have bank loans funded. Without this crucial step by the co-conspirators, the loans would not be funded and they would not gain access to the proceeds of the fraud. *Id.,* ¶ 17. Costello and Demarcus Hicks supplied counterfeit identification cards and other documents to allow Jones, Arreola-Martin, Pool, and Skorochod to carry out the conspiracy.

After the loans were approved and funded, loan proceeds went into fraudulent bank accounts opened in the names of the individuals, without their knowledge or consent. *Id.,* ¶ 16. Co-conspirators withdrew the fraudulently obtained proceeds to purchase goods and, quite often,

large quantities of gold in the identity theft victims' names from precious metal dealers from across the country. *Id.,* ¶ 14.  Precious metals were delivered to various addresses in the Bay Area where it was picked up by various co-conspirators posing as the real individuals.  PSR ¶ 14. Ultimately, gold was sold for cash to at least one local jewelry store. *Id.*

A large amount of cash was recovered from a safe deposit box controlled by relatives of Mark Hicks and Demarcus Hicks.  Of the actual loss of $2,082,260, over half of the proceeds have been recovered in cash and gold. *Id.,* ¶ 16.  Other proceeds represent cash which was withdrawn and spent by the members of the Conspiracy, including Mark Hicks.

### III. PROCEDURAL HISTORY

On February 12, 2020, Mark Hicks was arrested and taken into federal custody.  On the same date, he made his initial appearance and was remanded to custody.  On February 13, 2020, Mark Hicks was released on a $250,000 unsecured bond with U.S. Pretrial Services' supervision. Mark Hicks continues to perform well on supervised release and has not violated the terms of his release in over two and one-half years.

On March 3, 2020, the government filed a one-count Information against Mark Hicks, and co-defendants, Tyrone Alexander Jones, Susan Arreola-Martin, and Christopher Pool, charging them with a violation of 18 U.S.C. § 1349 (Conspiracy to Commit Wire Fraud and Bank Fraud).

On July 13, 2021, the government filed a 48-count Superseding Indictment against the aforementioned co-defendants along with Demarcus Hicks, Dioysius Costello, and Leif Skorochod.  The Superseding Indictment alleged violations of 18 U.S.C. § 1349 (Conspiracy to Commit Wire Fraud and Bank Fraud); 18 U.S.C. § 1343 (Wire Fraud); 18 U.S.C. § 1344(1), (2) (Bank Fraud); 18 U.S.C. § 1028A (Aggravated Identity Theft); 18 U.S.C. § 1956(h) (Conspiracy

to Engage in Monetary Transactions in Property Derived from Specified Unlawful Activity); 18 U.S.C. § 1956(a)(1)(B)(i) (Engaging in Monetary Transactions in Property Knowing the Transaction Was Designed to Conceal or Disguise); 18 U.S.C. § 1957 (Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity); and 18 U.S.C. § 922(g) - Felon in Possession of a Firearm.  The Superseding Indictment contained a forfeiture allegation pursuant to 18 U.S.C. § 981(a)(1)(C), 18 U.S.C. § 982(a)(2)(B), and 28 U.S.C. § 2461(c).  The Superseding Indictment charged defendant Mark Hicks in Counts 1 through 16, 18, 21, 23, 25, 28, and 30 through 47.

On March 21, 2022, Mr. Hicks pleaded guilty to Count One, a violation of 18 U.S.C. § 1349 (Conspiracy to Commit Wire Fraud and Bank Fraud), Count Three, a violation of 18 U.S.C. § 1343 (Wire Fraud), Count 13, a violation of 18 U.S.C. § 1344(1) (Bank Fraud), and Count 21, a violation of 18 U.S.C. § 1028A (Aggravated Identity Theft), pursuant to a negotiated plea agreement.

Mark Hicks is also on supervised release for another case, *USA v. Mark Hicks, et al.,* CR 13-0079 JD.  A Form 12 Violation has been filed in that case.

The Court is scheduled conduct its sentencing hearing, to impose its sentence on Mr. Mark Hicks, and to determine any Form 12 violation, on September 12, 2022, at 10:30 a.m.

## IV. OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT

Mr. Hicks has no objections to, or unresolved issues with, the Presentence Investigation Report authored by U.S. Probation Department.

## V. SENTENCING GUIDELINES CALCULATION

Pursuant to the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines"), which are advisory after the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220

(2005), Mr. Hicks has a total offense level of 29 for his offense.  PSR, ¶ 29.  This total offense level is reached by starting with a base offense level of seven for a violation of 18 U.S.C. § 1344(1), 18 U.S.C. § 1343, and 18 U.S.C. § 1349. *See* U.S.S.G. § 2B1.1(a)(1); PSR, ¶ 37.  Mr. Hicks is subject to an 18-level increase due to the intended, but not actual, loss of more than $3,500,000.  *See* U.S.S.G. § 2B1.1(b)(1)(J); PSR, ¶ 38.  The offense level is also increased by two levels pursuant to U.S.S.G. § 2B1.1(b)(11)(ii) for the possession of five or more means of identification, PSR ¶ 39, and another two levels pursuant to U.S.S.G. § 2B1.1(b)(17)(A) for $1,000,000 in gross receipts from one or more financial institutions.  PSR ¶ 40.  This results in an adjusted offense level of 29.  PSR, ¶ 27.

Mark Hicks's offense level is then decreased by three levels for his acceptance of responsibility.  U.S.S.G. §§ 3E1.1(a) and (b); PSR, ¶¶ 51-52.  Mark Hicks's offense level is also decreased by an additional two levels, based on the government's offer of a global disposition, pursuant to U.S.S.G. § 5K2.0(a)(2)(B).  His final offense level is 24.[2]

Mr. Hicks's criminal history score is thirteen and his criminal history category is VI. PSR, ¶¶ 63-65.  Therefore, Mr. Hicks's total offense level of 24 indexed with a Criminal History Category VI yields an advisory guideline range of 100-125 months.

This Court must only consider, but is not bound by, this advisory guideline range. *See United States v. Hammons,* 558 F.3d 1100 (9th Cir. 2009).

///

///

---

[2] The PSR states Mr. Hicks' offense level is a 26, but only because the Probation Department is not permitted to account for global resolution discounts.  PSR, ¶ 111.  That discount as contemplated in the Plea Agreement is a two-level discount thus making Mr. Hicks offense level a 24.

## VI. SENTENCING RECOMMENDATION

Mr. Hicks submits that the Court should sentence him to a 66-month sentence followed by a three-year term of supervised release.  Mr. Hicks further submits that such a sentence is an appropriate variance for Mr. Hicks and is sufficient and not greater than necessary to comply with the directives of 18 U.S.C. § 3553(a), namely: the nature and circumstances of the offense; Mr. Hicks's history and characteristics; the need for the sentence imposed to reflect the seriousness of the offense, to afford adequate deterrence, and to provide Mr. Hicks with the opportunity to address his personal health issues.

### A.  The Nature and Circumstances of the Offense, as well as Mr. Hicks's History and Characteristics, Support the Recommended Sentence

Under 18 U.S.C. § 3553(a)(1), "the court, in determining the particular sentence to be imposed, shall consider the nature and circumstances of the offense and the history and characteristics of the defendant."  These two factors support Mr. Hicks's sentencing position.

### 1.  Nature and Circumstances of the Offense

In 2018, having been out of custody for a year or so, came into contact with co-defendants Dioysius Costello and Demarcus Hicks.  From that meeting came the unfortunate and regrettable plan to reinvolve Mark Hicks in fraudulent conduct.

Mark Hicks's involvement in the conspiracy was heavy on the front end.  Because Mark Hicks is paralyzed from the chest down and is in a wheelchair, he is homebound and relies on others for everything.  While Mark Hicks did use the internet to obtain personal information on individuals, obtain credit reports on those individuals, and call banks and vendors pretending to be some of those individuals, Mark Hicks did not ever leave his bedroom to carry out the actions of the conspiracy.  Co-conspirators completed the conspiracy without Mark Hicks.

To argue that Mark Hicks is a planner, organizer, or mastermind, or to conclude that Mark Hicks is anything but a "normal" or "regular" member of the conspiracy, is nonsensical. The Court need look no further than the fact that neither the Probation Department nor the government seek any kind of upward role adjustment for Mark Hicks. Great weight should also be given to Costello's development and involvement in the same kind of fraud using counterfeit identification while Mark Hicks was still in custody.

Mark Hicks's crime was not fueled by greed or a wish for a lavish lifestyle; he had neither. He lives in a small bedroom in his mother's home in Benicia, California. He has a room in his mother's house and lives on government aid. His mother must help him with basic everyday tasks – such as bathing, urinating, or getting dressed – that we take for granted. Mark Hicks's physical condition does not allow him to drive any longer. His mother takes him to every medical appointment. This is not an individual enjoying the trappings of a lavish or criminal lifestyle.

Clearly, the nature and circumstances of Mr. Hicks's conduct support a reduced sentence.

## 2. Mark Hicks's History and Characteristics

Mark Django Hicks was born on April 21, 1980, in Oakland, California to his father, Mark Hicks, Sr., and his mother Barbara Hicks. Mark Hicks has a half-brother, Demarcus Hicks, and a sister, Tia Hicks. During Mark Hicks's childhood, his father, a truck driver, abused drugs and alcohol and moved the family between the San Francisco Bay Area, Las Vegas, Los Angeles, and New Orleans. Even with his father's drug addiction and long distance moving, Mr. Hicks tried to have a stable childhood. He was a good student and played basketball, football, and baseball, but with his father gone most of the time on the road, Mr. Hicks's formative years were quite difficult. When he was 13, his parents separated and Mr. Hicks went to live with his

mother and saw his father only during summer vacation.  Even with limited contact Mr. Hicks

knew that his father's drug abuse became more significant as time went on.  Mr. Hicks learned

that his father later abused heroin.  He eventually passed away in 2011, at the age of 50.  PSR ¶

73.

Learning from his father's shortcoming, Mark Hicks has tried to be the best father he

could be to his two children, Noble Mitchell (age 16) and Sparkle Hicks (age 16).  PSR, ¶¶ 74-

75.  Mr. Hicks keeps has close relationships with his children and is a regular fixture in their

lives.  Velma Arellano, Mr. Hicks's aunt summarized Mr. Hicks' childhood well:

> Unfortunately, Mark's parents divorced in his early teens. Mark took up the mantle of
> "man of the house".  He would take two busses to take his younger sister to school and
> then take three buses to get to high school. He never complained but considered it his
> duty to help care for his sister. He still exemplifies this level of commitment to his
> family.

Declaration of Edwin Prather in Support of Defendant Mark Django Hicks's Sentencing

Memorandum and Request for Downward Variance ("Prather Decl."), ¶ 2, Exh. A, ("Letter from

Velma D. Arellano").

Mr. Hicks's sister, Tia Hicks, also confirmed Mr. Hicks's dedication to family:

> I have known Mark my entire life.  He is my big brother, nine years older than
> me.  In many ways, Mark has played more of a father role to me growing up then a
> brother, stepping in to care and provide for me when our father wasn't always present.
> When I was in elementary school and he was in high school, he took a bus across the city
> to make sure I was in school on time before getting back on the bus to attend his high
> school classes.  This was helpful for me and my mom, as she had to commute to work
> from Oakland to San Francisco in the early mornings.  He bought me my first pair of
> new, popular sneakers growing up, which may seem superficial, but was actually
> extremely important for my self-esteem growing up in the 90s and early-2000s in
> Oakland.

Prather Decl. ¶ 3, Exh. B, ("Letter from Tia Hicks"); *see also* Prather Decl. ¶ 4, Exh. C, ("Letter

from Kelda Williams") ("For a person in a wheelchair, he continues to stay ambitious and

creating ideas to further his brand.").

DEFENDANT MARK DJANGO HICKS'S SENTENCING MEMORANDUM AND REQUEST
FOR DOWNWARD VARIANCE [CASE NOS. CR 20-0108 JD and CR 13-0079 JD]

10

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Mark Hicks found his life's work in music.  He was always interested in music from a young age.  At the age of ten, Mark Hicks had a newspaper route to earn money to try to support his endeavors in the music business. Eventually, Mr. Hicks was able to obtain his own used studio and recording equipment and start recording his own songs.  As a teenager, Mark Hicks started a duo with a fellow performer and started gaining notoriety throughout Northern California. Mr. Hicks started to go by stage names such as Kafani and Amir Rashad, and performed at clubs, concerts and other gatherings.

Mr. Hicks's big break came in 2005 when he wrote and several hit records which internationally known artists.  Mr. Hicks was himself becoming well known outside of the Bay Area.  During this time, Mr. Hicks devoted himself to his music, the community, charity work, and being the best person he could be.

Erica Denton, a longtime friend, confirmed that Mr. Hicks "still goes back to the community he grew up in to motivate the youth and financially help families in need. … I do not believe the truly kind and generous need to advertise their caring generosity, as most kind and generous people are also humble, which is also an attribute of Mr. Hicks despite his celebrity notoriety… ."  Prather Decl. ¶ 5, Exh. D, ("Letter from Erica Denton"); *see also* Prather Decl. ¶ 6, Exh. E, ("Letter from Christensen Sanders") ("I have known him to support and mentor younger artists. … He is an important figure in Bay Area hip hop culture, and I know that he will continue to inspire and make a positive impact.").

Unfortunately, over a decade ago, Mr. Hicks involved himself in a criminal conspiracy to defraud.  Mr. Hicks committed mail and wire fraud and was arrested and charged in 2013 in *USA v. Mark Django Hicks, et al.,* CR 13-0079 PJH.  However, while on Pretrial Release in that matter, on September 28, 2013, Mr. Hicks was shot several times in East Oakland.  Mr. Hicks

was effectively dead when he arrived at Highland Hospital. While the physicians saved him from death, they did not save his life – he was, and is, paralyzed from mid-chest down and, according to his doctors, will be for the rest of his life. He suffers substantial pain every day, and his life has been considerably diminished as a result of a lifetime of complications from this horrific crime. Mr. Hicks's assailant was neither identified nor caught.

On July 29, 2015, Mr. Hicks received a 39-month sentence from the District Court to be followed by a three-year term of supervised release.

After his release from the Bureau of Prisons in 2017, two things occurred:

First, Mr. Hicks returned to music and serving the community. He recorded new songs and performed old ones. One of his songs was used during the half-time show of the NFL Super Bowl and he performed with a number of musical headliners during this period. Mark Hicks also revisited his involvement with Hip-Hop with Disabilities, a program operated by Solano County Department of Health and Social Services, Behavioral Health Services Division.

Denise Coleman, a Director on Solano County's Drug and Mental Health Advisory Board, shared:

> [Mr. Hicks] has always been a role model to the young men in my community and many of the disabled artists who have been impacted by gun violence. The motivated people to never give up on dreams due to the injustice or unfairness of life. I have documented [Mr. Hicks's] working on pulling his life back together after recovering from jail, and the trials of living in a wheelchair. Even during his own struggles and mental health challenges, he was resilient and pulled a team together to do a Hip Hop with Disabilities tour.

Prather Decl. ¶ 7, Exh. F, ("Letter from Denise Coleman").

Next, while out of custody, Mark Hicks had a newfound access to prescription painkillers that he did not have previously. Mr. Hicks admits that he became addicted to those painkillers that greatly affected his judgment. He lived in a fog based on those painkillers and his addiction

DEFENDANT MARK DJANGO HICKS'S SENTENCING MEMORANDUM AND REQUEST FOR DOWNWARD VARIANCE [CASE NOS. CR 20-0108 JD and CR 13-0079 JD]

12

affected his decision to participate in the current conspiracy when he absolutely knew better. *See* Prather Decl. ¶ 8, Exh. G, ("Letter from Barbara Hicks") ("I know that this had a definite effect on his mood, his mental state, and his decision making. I am sure that these painkillers had an effect on him to get involved with this criminal conduct.")

Through the Superseding Indictment and his change of plea in this case, Mr. Hicks has continued to be a positive influence in his children's lives. *See* Prather Decl. ¶ 8, Exh. G, Letter from Barbara Hicks ("He takes interest in their well-being.  He encourages them to get an education and go to college to be successful.").  His son, Noble Mitchell, is an honor roll student who works part-time at Walmart.  Prather Decl. ¶ 9, Exh. H, Letter from Noble Mitchell.  His son stated that Mr. Hicks "…taught me that I need to work hard and get an education".  Id.  Mr. Hicks's friends agree that he is a good father.  *See* Prather Decl. ¶ 10, Exh. I, Letter from Randall Anderson ("He is a big family man that stays involved with his children, he motivates them on a regular basis and pushes them to do more than he did.").

A high school friend, Keita Jones, summarized Mr. Hicks well:

He never let his new-found fame and popularity change who he was a person and continued to have the same down to earth demeanor he had back in high school.

Given the kind-hearted nature Mark has, it came as no surprise to me that he has used his platform to volunteer his time meeting and speaking with people who have also suffered life changing accidents that have resulted in paralysis. His time, community and service has also inspired paraplegics to keep their spirits up and not give up on life, providing them with similar words of encouragement that he gave me when we first met back in the 12th grade.  I have no doubt that the time and words given to those in similar situations has he, has helped them through both their physical and emotional healing processes and that his words have touched them in their hearts the way they touched me decades ago.

Prather Decl. ¶ 11, Exh. J, Letter from Keita Jones.

Mr. Hicks has inspired those around him through his work in the community, but Mr. Hicks's health will only deteriorate to the point of ending his life prematurely.  Dr. Lance Stone,

of the Fairmont Hospital in San Leandro, California, summarized for the Court in 2015, what

happened to Mr. Hicks in September 2013 and what would occur subsequently.  See PSR, ¶ 78.

All of Dr. Stone's diagnoses and predictions on Mr. Hicks's health have been confirmed.

Mr. Hicks was transported to the emergency room of Highland Hospital suffering from multiple acute life threatening gunshot wounds.  He was in pulseless, hypotensive shock at the time of admission.  He suffered a gunshot wound to his mandible and second gunshot wound to his left arm that directly affected the nerves in his upper limb.  More significantly, he suffered a gunshot wound that completely severed his spinal cord at the thoracic level 6.  As a consequence he has absent motor control and sensation from approximately the area just below his nipples down.  He will never regain use of his lower extremities, bowel, bladder function and will remain a complete paraplegic.  He should be reevaluated yearly by a neurosurgeon along with spinal x-rays to assess his spinal column, he is at risk for spinal kyphosis deformity and spinal Charcot joint below his level of injury which if untreated will lead to further disability.

As a consequence of his spinal cord injury, he will remain permanently confined to a wheelchair.  He continues to experience considerable central nerve pain notwithstanding his paraplegia.  While I have tried various narcotic and non-narcotic medications to alleviate the pain, Mr. Hicks still suffers considerable daily pain and suffering.  He will need to continue to take opioid and non-opioid analgesic medications for the foreseeable future.  As a result of the spinal cord trauma, he has no control over his bladder and bowel function and is incontinent of both urine and stool. A catheter must be inserted 4 to 6 times a day to empty his bladder.  There is an on-going risk of infection including bladder and kidney damage, both of which are life threatening.  He requires lab testing of his urine monthly, and needs to be reevaluated by a urologist twice a year. In addition, he must have his kidney metabolism checked once a year, including a renal ultrasound, urodynamics, which is the accepted minimum standard of care.

As a result of the spinal cord trauma, he has no control over his bowels function. At least once day, a caregiver must insert a rectal suppository and perform rectal digital stimulation to precipitate the evacuation of his bowels.  If the procedure is not accomplished regularly or effectively, Mr. Hicks would suffer bowel obstruction, megacolon and/or infection,

As a result of his spinal cord injuries and limited movement, he is subject to skin breakdown or pressure wounds if he is not being repositioned every two hours and having pressure relief on parts of his paralyzed body.  He developed a pressure wound earlier this year, that wound did not heal, resulting in major surgery to address the resulting infection that began on the skin near his tailbone.  At that time, he underwent plastic surgery in which a muscle was rotated to the area to reduce the likelihood of reoccurrence and heal the underlying bone infection.  He should be reevaluated by a plastic surgeon annually which is the standard of care for someone with a spinal cord injury and established demonstrated high risk.

DEFENDANT MARK DJANGO HICKS'S SENTENCING MEMORANDUM AND REQUEST FOR DOWNWARD VARIANCE [CASE NOS. CR 20-0108 JD and CR 13-0079 JD]

14

To reduce the likelihood of skin damage and infection, Mr. Hicks requires a special custom wheelchair cushion and use a special low air flow mattress that varies the air flow/pressure during the night to vary the pressure on his skin.  If untreated or allowed to develop a pressure wound will likely lead to osteomyelitis of the underlying bone which is life threatening and requires long-term IV antibiotics and surgery.

Mr. Hicks suffers considerably from uncontrolled muscle spasms, particularly around his hips and knees.  The spasms can shorten his muscles, and may lead to him being confined to bed and irreversible muscle contractures.  As a result, it is very important that at least twice day that someone provide range of motion to stretch out his muscles.  Someone has to assist him manage and control his lower extremity range of motion.  He should be reevaluated biannually by a physical therapist and physical medicine and rehabilitation physician to review his equipment needs, range of motion, skin, and wheelchair positioning.

Mr. Hicks does not have normal pulmonary function.  As a result, he has a high risk of pneumonia.  As noted above, due to his limitations on bladder and bowel movements, he has increased risk of bladder, kidney and colon infections. Collectively, his greater vulnerability to infection makes it likely he will be hospitalized twice a year for treatment including intravenous antibiotics.  With regard to the impact of his injuries and conditions on incarceration, his medical condition makes him unable to meaningfully protect himself.  He will need nearly constant care.  He will be much more subject to infection in a custodial setting than the average inmate, and he will be less able to respond/survive any infection.

PSR ¶ 78.

Mr. Hicks' condition is severe and requires constant care and hospitalization.  Mr. Hicks has been admitted to the hospital several times this year with various infections and he has also had multiple treatments to keep his condition from worsening.  In that vein, Mr. Hicks's current treating physician, Dr. Patricia K. Foo, of Highland Hospital in Oakland, California, reviewed Dr. Stone's letter, as well as Mr. Hicks's medical records and history and provided, *inter alia,* the following:

[Mr. Hicks] suffered severe and nearly lethal gunshot wounds in 2013 which severed his spinal cord in the thoracic spine.  He became and continues to be a complete paraplegic with absent motor and sensory function from approximately the level of the nipples down.  His paraplegia has left him wheelchair dependent and requiring 24/7 care. As a result of his spinal cord injury, he does not have bladder control, which necessitates manual catheterization every 4-6 hours and regular botulinum toxin injections.  Despite

excellent urologic care, he still suffers from frequent urinary tract infections and has been hospitalized with urosepsis - a significant and potentially life- threatening infection - approximately twice a year.  This is a common complication in patients with neurogenic bladder like [Mr. Hicks], and often leads to significant morbidity and mortality.  Because of his frequent urinary tract infections, he has also developed increasing antibiotic resistance with his infections over time, which is also a common occurrence in patients with neurogenic bladder.  This means he will have increasing requirements for potent intravenous antibiotics over time, even with more simple infections. Without the excellent 24/7 care that he currently receives, it is very likely that he will suffer more frequent and progressively recalcitrant urinary tract infections.

[Mr. Hicks] has shared with me his experiences during his last incarceration and its effects on his health.  The last time he was incarcerated, he was sent to wrong facility and was handcuffed to a bed for 3 months.  It caused him to gain rapid weight, which likely contributed to his developing diabetes for which he requires regular medication.  It also led to reopening of a skin flap, which led to another surgery while in custody.  This injury contributed to the chronic pain that Mr. Rashad now has.  Although [Mr. Hicks] is many years out from his initial injury, he remains at high risk for pressure ulcers and other injuries due to his lack of sensation below the level of his spinal cord injury.  He recently suffered an accidental 2nd degree burn on his toe at home because of this.  His 24/7 care is critical to reducing the occurrence of these injuries, which could quickly become limb-threatening infections if not identified and addressed promptly.  Based on his current medical conditions, I believe that incarceration would have a significant negative impact on [Mr. Hicks's] health and could lead to shortening his life expectancy.

Prather Decl. ¶ 12, Exh. K, ("Letter from Dr. Patricia K. Foo").

Mr. Hicks has spent almost nine years in a wheelchair, paralyzed from his mid-chest down.  It is clear that his condition has deteriorated over that time.  Mr. Hicks now has 24-hour around-the-clock care.  His caregiver is necessity for Mr. Hicks to bathe, to have a bowel movement, and to move from his bed to his wheelchair.  He is losing the ability to handle any daily function by himself.  Mr. Hicks's incarceration will have a "significant negative impact on his health and "could lead to shortening his life expectancy".  *Id.,* Letter from Dr. Patricia K. Foo.

Between Mr. Hicks' history and characteristics including his background, his addiction to pain killers, his last almost decade as a paraplegic, and his deteriorating life expectancy militate in favor of the recommended sentence in this case.

**B. A 66-Month Sentence Followed by Three Years of Supervised Release Meets the Directives of 18 U.S.C. § 3553(a)(2)**

18 U.S.C. § 3553(a)(2) directs the Court to consider "the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence, and to protect the public from further crimes."  A 66-month sentence followed by three years of supervised release meets these directives.

**1.  The Recommended Sentence Reflects the Seriousness of the Offense, Promotes Respect for the Law and Provides Just Punishment for the Offense**

While all violations of federal law are to be taken seriously, there can be no doubt that for certain offenses, the Court may consider certain types of crimes to be more serious than others. While financial fraud and identity theft are significant crimes, the United States Sentencing Commission has noted the seriousness of the offense may be lessened, for example, if the crime was not violent.  *See* 28 U.S.C. § 994(j) (prison is generally inappropriate in "cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense," while some term of imprisonment is generally appropriate for "a person convicted of a crime of violence that results in serious bodily injury").

Mr. Hicks's intended to be involved in a simple financial fraud which took advantage of lending institutions and banks.  He had previous dealings with law enforcement and fraud and should have known better that to get involved with this conspiracy.  Mr. Hicks makes no excuses for his conduct and accepts responsibility completely.  While these circumstances do not minimize Mr. Hicks's offense and the trouble and inconvenience caused to others, a 66-month sentence followed by three years of supervised release, accurately accounts for the seriousness of the offense, promoting respect for the law and providing for just punishment.

### 2.   The Recommended Sentence Affords Adequate Deterrence

Empirical evidence is unanimous that no relationship exists between sentence length and general or specific deterrence, regardless of the crime type. *See* Andrew von Hirsch, *et al.*, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) (concluding that "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects.").

While Mr. Hicks served over three years on his previous fraud case.  And while his criminal history and the existence of another fraud offense reflects poorly on the individual standing before the Court, Mr. Hicks is not a lost cause.  Mr. Hicks is active in his community and did not seek to live a lavish lifestyle through the commission of his crimes.  *See* Prather Decl. ¶ 8, Exh. G, Letter from Barbara Hicks ("I think he became involved with this fraud scheme for the camaraderie and not the money. It has never been about the money for Mark. He is such a giving person and he is able to function with very little. He does not live that musician lifestyle. Mark and I are simple people and I am quite satisfied taking care of my son and his daily needs.").  He is seen as someone who regularly gives back to others.  He will be in a Bureau of Prisons Federal Medical Center for the entirety of his sentence and a longer sentence will not provide additional deterrence for Mr. Hicks.

### C.   A Sentence of 66 months Followed by Three Years of Supervised Release Avoids Unwarranted Sentencing Disparities

The Court previously sentenced three co-defendants who participated in the same conspiracy that is implicated in this case. The Court will also consider sentences for two other co-defendants, Demarcus Hicks and Dioynsus Costello, who participated in the same conspiracy.

DEFENDANT MARK DJANGO HICKS'S SENTENCING MEMORANDUM AND REQUEST FOR DOWNWARD VARIANCE [CASE NOS. CR 20-0108 JD and CR 13-0079 JD]

18

To be clear, the individuals sentenced and to-be sentenced were all involved in the same conspiracy through various overt acts.

The Court sentenced co-conspirator Leif Skorochod to 14.5 months to be followed by three years of supervised release for his involvement in the conspiracy.  The Court sentenced co-conspirator Christopher Todd Pool to 15 months to be followed by three years of supervised release for his involvement in the conspiracy.  The outlier is co-conspirator Susan Arreola-Martin who was sentenced by the Court to 84 months to be followed by three years of supervised release for her involvement in the conspiracy and also for her distribution of fentanyl which resulted in the death of a family member.

Although the PSR recommends a variance and below guideline sentence of 87 months, Mark Hicks should receive a sentence more in line with, if not similar to, the sentences the Court imposes on co-defendants Costello and Demarcus Hicks.

In the conspiracy at hand, Mark Hicks, Donnie Costello and Demarcus Hicks were involved in the creation and planning of the conspiracy to defraud financial institutions and bank lenders through the use of personal information.  However, Mark Hicks was not present in the San Francisco Bay Area in 2017 when Costello began a conspiracy with Arreola-Martin to impersonate individuals using their personal information to access their bank accounts.  That conspiracy was the precursor of the conspiracy at hand.  It similarly utilized counterfeit identification cards and involved going into the banks to pose as the victims.  When Mark Hicks became involved with Costello and Demarcus Hicks in 2018, Mark Hicks was able to do what he could to support the conspiracy from his bedroom since he was wheelchair bound and for the most part, could not leave his home.  Mark Hicks required help to do his part in the conspiracy,

but the conspiracy could not have been completed without the physical step of going into the lending institutions and impersonating the borrowers and signing the notary books.

Costello and Demarcus Hicks conspired to impersonate the identity theft victims in order to sign loan documents with numerous notaries and to enter into banks to complete the fraud/theft. They enlisted Skorochod, Pool, and Arreola-Martin to handle the most essential part of the conspiracy. Without all members, the conspiracy could not have been accomplished.

As such, Mark Hicks's sentence should be similar to that of co-conspirator Costello and Demarcus Hicks.

### D. The Court Should Allow Mr. Hicks to Surrender Directly to the BOP Federal Medical Center to Which He is Assigned

The Bureau of Prisons (BOP) classifies inmates who require 24-hour skilled nursing care as "Care Level 4" inmates. *See* Bureau of Prisons Clinical Guidance, Care Level Classification for Medical and Mental Health Conditions or Disabilities, May 2019. Quadriplegia is specifically identified as a Care Level 4 classification. *Id.* at p.5. Because Mr. Hicks requires assistance with activities of daily living such as eating, urinating, defecating, bathing, and dressing/undressing, Mr. Hicks must be allowed to surrender directly to the BOP Federal Medical Center (FMC) to which he is assigned. Additionally, because the BOP has a policy against transporting inmates who cannot walk on their own, the decision to allow Mr. Hicks to surrender in person to the FMC is as much for the BOP and U.S. Marshal's Office, as it is for Mr. Hicks.

As such, the Court should note in the judgment that Mr. Hicks is a quadriplegic and a Care Level 4 inmate and allow Mr. Hicks to surrender to the FMC once he receives his designation.

### E.  Mr. Hicks Should Be Sentenced to Ten Months in Custody and Ten Months in Home Detention as a Condition of Supervised Release on His Form 12 Violation

As previously mentioned, Mr. Hicks has a Form 12 violation for which he has admitted and awaits sentencing.  Based on the aforementioned arguments, the Court should sentence Mr. Hicks to no more than ten months of custody time, consecutive to the 66-month sentence the Court should impose on his new matter.  The Court should also impose ten months of home detention as a condition of Supervised Release to be completed upon his release from custody. Mr. Hicks is ineligible for halfway house placement due to his disability and medical needs, and as such, home detention is the appropriate sentence.

### VIII. CONCLUSION

For the foregoing reasons, namely, the Court should sentence Mr. Hicks to a 66-month sentence followed by a three-year term of supervised release, with an additional ten months of custody time to run consecutively for his Form 12 violation on CR 13-0079 JD.  Such a sentence is an appropriate resolution to this case to both punish Mr. Hicks, but also to recognize his personal circumstances under 18 U.S.C. § 3553(a).  Mr. Hicks' medical condition will cause him to have a shortened life and a lesser quality of life thus vitiating the need for a lengthy sentence.

A 76-month total custodial sentence, followed by 10 months of home detention, sufficiently captures Congressional policy of imposing harsher sentences on repeat offenders, and also fulfills Congress' other policy objectives aimed specifically at sentencing courts embodied in 18 U.S.C. § 3553(a), such as the mandate that the Court impose a sentence that is sufficient, but not greater than necessary, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence, and to protect the public from further crimes.

1    A 76-month total custodial sentence, followed by three years of Supervised Release

2  including ten months of home detention is the right result in this case.

3  Dated: August 29, 2022                                    Respectfully submitted,

4

5                                                        _____/S/_____
                                                        EDWIN PRATHER
6                                                       PRATHER LAW OFFICES
                                                        Attorneys for Defendant
7                                                       MARK DJANGO HICKS

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25